943 F.2d 48
 1992 A.M.C. 304, 1992 A.M.C. 398
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
CSX TRANSPORTATION, INCORPORATED, a Virginia Corporation,
Plaintiff-Appellant,
v.
HELLESPONT MARINER, her engines, boilers, tackle, apparel,
etc., in rem, Mariner Navigation Limited,
Baker-Whiteley Towing Company,
Defendants-Appellees.
 No. 90-1553.
 United States Court of Appeals, Fourth Circuit.
 Argued July 9, 1991.
Decided Sept. 10, 1991.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. Herbert N. Maletz, Senior District Judge. (CA-87-2892-PN)
 Argued: Thomas L. Samuel, Whiteford, Taylor & Preston, Baltimore, Md., for appellant.
 Kathryn Miller Goldman, Quinn, Ward and Kershaw, P.A., Baltimore, Md., for appellees.
 On Brief: Nancy S. Allen, Whiteford, Taylor & Preston, Baltimore, Md., for appellant.
 Kieron F. Quinn, J. Stephen Simms, Quinn, Ward and Kershaw, P.A., Baltimore, Md., for appellee Baker-Whiteley Towing;
 Manfred W. Leckszas, Ober, Kaler, Grimes & Shriver, Baltimore, Md., for appellee Mariner Navigation.
 D.Md.
 AFFIRMED.
 Before ERVIN, Chief Judge, and MURNAGHAN and SPROUSE, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 CSX Transportation, the owner of a dolphin[1] at its Curtis Bay Coal and Ore Piers in Baltimore, Maryland, appeals from the judgment of the district court denying its claim against Mariner Navigation, Ltd., the owner of the vessel M/V Hellespont Mariner (the "Mariner"), and Baker-Whiteley Towing Company, the owner of the tugboats Hermes and Britannia (collectively "the boat owners"), for damages sustained by the dolphin during the docking of the Mariner. Finding no error, we affirm.
 
 
 2
 On June 28, 1987, the agents of the Mariner made a request for tug assistance to berth at the CSX Ore Pier. In response, the tugs Hermes and Britannia met the Mariner in the Fort McHenry Channel. The Britannia was deployed on the starboard side and the Hermes was on the port side of the Mariner. The Britannia's master, Captain Canavino, boarded the Mariner and acted as docking master. First mate Lukowski was responsible for maneuvering the Hermes. Both tugs were attached to the Mariner with three lines and propulsion was provided by the Mariner's engine and propellers. This deployment was routine for docking in the Port of Baltimore.
 
 
 3
 During the course of the docking, Canavino maintained communication with both tugs by walkie-talkie and the tugs responded either by radio or, if responding to navigation orders, by peep whistles.
 
 
 4
 After the Mariner turned in the turning basin and headed for the Coal Pier, Canavino asked Lukowski how the situation looked at the end of the Coal Pier and whether there was enough clearance to safely pass. When Lukowski responded with an "all clear," Canavino told him to keep him posted. This conversation transpired about five minutes before the bow of the Mariner reached the dolphin, which is located about fifteen feet from the end of the Coal Pier. There was no further communication between Lukowski and Canavino regarding the clearance. Lukowski later testified that at 100 feet and 50 feet it appeared that the clearance was sufficient.
 
 
 5
 When the Hermes was approximately one-third of the way alongside of the dolphin, it rubbed fenders with the dolphin until the tug's stern cleared it. Canavino remained unaware of the contact until the Mariner was docked and he had returned to the Britannia. As a result of the collision, the dolphin was pushed into a corner of the pier. Some of the pier timbers were broken and a "diamond" plate on the pier buckled. The cost of repair was $39,400.
 
 
 6
 CSX filed suit for damages against Baker-Whiteley, alleging negligence on the part of the crew of the Hermes for failure to adequately communicate the risk of collision to Canavino. CSX also named Mariner Navigation as a defendant, for the alleged negligence of Canavino, based on the borrowed servant doctrine.[2]
 
 
 7
 The district court found that neither defendant was negligent. Accordingly, it entered judgment in favor of both. CSX appeals.
 
 
 8
 In admiralty, a moving vessel which collides with a stationary object is presumptively at fault. See City of Boston v. S/S Texaco Texas, 773 F.2d 1396, 1398 (1st Cir.1985); Bunge Corp. v. M/V Furness Bridge, 558 F.2d 790, 794-95 (5th Cir.1977), cert. denied, 435 U.S. 924 (1978); Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co., 377 F.2d 724, 726 (5th Cir.1967). The logic behind this presumption is self-apparent:
 
 
 9
 The presumption derives from the common-sense observation that moving vessels do not usually collide with stationary objects unless the vessel is mishandled in some way. It stems also from the observation that "any evidence of actual negligence, or the lack of it, is likely to be known only to the persons on board, who are in the best position to either keep damaging evidence hidden, or bring favorable evidence forward."
 
 
 10
 Wardell v. Dep't of Transp., 884 F.2d 510, 512 (9th Cir.1989) (citations omitted). The parties do not question the initial application of the presumption to the facts of this case. However, appellants dispute the district court's finding that the boat owner defendants countered with sufficient evidence to overcome the presumption.
 
 
 11
 The presumption of fault may be overcome by defendants' showing that (1) the moving vessel was without fault; (2) the collision was the fault of the stationary object; or (3) the accident was inevitable. See Wardell, 884 F.2d at 513; Bunge Corp., 558 F.2d at 795; Carr v. Hermosa Amusement Corp., 137 F.2d 983, 985 (9th Cir.1943), cert. denied, 321 U.S. 764 (1944). The burden is a heavy one and must be proved by a preponderance of the evidence. Moreover, the presumption must be disproved. It will not suffice for the party against whom it is operating to "merely com[e] forward with countervailing evidence." Delta Transload, Inc. v. M/V Navios Commander, 818 F.2d 445, 449 (5th Cir.1987) (citing James v. River Parishes, Co., 686 F.2d 1129 (5th Cir.1982)).
 
 
 12
 Here, the district court held that the defendants prevailed under two prongs of the rebuttal doctrine, finding that the evidence established an "inevitable accident" and that the moving vessel was without fault. The court factually concluded that it was necessary to keep the vessel as close to the dock as possible because the passage between the shoal area and the dolphin was narrow. It found that Canavino and Lukowski were qualified seamen, experienced in this type of berthing, and that the dolphin was meant to serve as a warning device and as a guide and pivot, to protect the pier. It also found that the difference between clearing and not clearing the dolphin was only a matter of a few inches or feet at the most. Under these circumstances, the district court held, Canavino and Lukowski exercised reasonable care and skill in docking the Mariner. Although there may have been an error in judgment, the court found that their actions did not rise to the level of fault or negligence. See United Fruit Co. v. Mobile Towing & Wrecking Co., 177 F.Supp. 297 (S.D.Ala.1959) (due care required, not infallibility). Lukowski had no reason to inform Canavino of clearance problems because, at all times, none were apprehended.
 
 
 13
 CSX now argues that these factual findings are insufficient to constitute a rebuttal of the presumption and, hence, are clearly erroneous. We disagree. The findings with respect to the size of the channel, the difficulty of maneuvering vessels past the dolphin, and the experience of the vessels' officers are wholly supported by the evidence in the record. We cannot quarrel with the district court concerning the circumstances of docking and its measuring the standard of care accordingly owed by the officers, nor with its conclusion that they have not breached their duties to use reasonable care. Once the defendants successfully rebutted the presumption of fault, CSX was required to counter with affirmative proof of negligence, but, it declined even an attempt, with expert testimony or otherwise. Instead, it chose to rely solely upon the maritime presumption. In our view, the district court's findings supporting the rebuttal of that presumption are not clearly erroneous. CSX had its opportunity to meet defendants' evidence and did not.
 
 
 14
 In view of the above, the judgment of the district court is affirmed.
 
 
 15
 AFFIRMED.
 
 
 
 [1]
 The dolphin consisted of 29 seventy-foot 20-pound creosoted yellow pine pilings clipped together and wrapped with galvanized wire. Approximately 30 feet of each piling was below the mudline, 25 feet between the mudline and the water surface and 15 feet above the surface of the water
 
 
 [2]
 Under the borrowed servant doctrine, the docking pilot becomes the borrowed servant of the vessel employing the tug's services. Any negligence of the pilot is imputed to the owners of the docking vessel. Sun Oil v. Dalzell Towing Co., 287 U.S. 291 (1932)